JAMES J. McCOMB, Respondent and Appellant, *v.* THE BARCELONA APARTMENT ASSOCIATION, *et al.*, Appellants and Respondents.

*Court of Appeals, June 7, 1892.*

Affirming 56 Hun, 644.

1. *Contracts. Construction.*—The several agreements made between the different parties interested in the erection of the apartment houses in question were so construed as to transfer to the respective associations the obligation to repay to plaintiff the respective sums of money advanced by him to the Central Park Building Company to complete the building belonging to each corporation, and to render the mortgages executed to him therefor free from the taint of fraud.

2. *Same.*—A conditional subscriber to the stock of the building company subject to the right of an election to surrender his interest therein and to be repaid the money advanced to it to be used to complete the construction of the buildings, stands, after such election and notice thereof, simply as an individual loaning the money for the benefit of the associations.

Cross appeals from a judgment of the general term of the supreme court, first department, modifying a judgment entered upon the report of a referee, and as modified affirming the same.

*George H. Adams*, for defendant.

*Thomas H. Hubbard*, for plaintiff.

HAIGHT, J.—This action was brought to foreclose two mortgages executed by the defendant, the Barcelona Apartment Association, to the plaintiff, January 14, 1884, upon the lands of the Association, one for one hundred thousand dollars, and the other for fifty thousand dollars, payable May 1st, 1886. The mortgages were made to secure the payment of the bonds of the defendant, the Barcelona Apartment Association, bearing even date therewith, and containing

provisions authorizing the mortgagee to declare the principal sum therein mentioned due at an earlier date if default should be made by the mortgagor, as therein expressed. By the terms of the bonds and mortgages, interest on the principal sums mentioned at the rate of six per cent. per annum was payable half yearly. The defense is that the mortgages were void for the reason that they were given to secure the indebtedness of another association, induced by the fraudulent contrivance of the plaintiff; that two-thirds of the stockholders of the Barcelona Apartment Association never assented to the giving of the mortgages; that they are tainted with usury, and that the amount found due thereon by the referee is largely in excess of that which is in fact due, etc.

This action was one of eight suits, each of which was brought for the foreclosure of similar mortgages, which suits were tried together before the same referee resulting in similar judgments, in four of which appeals were taken and submitted with that of the Barcelona Apartment Association. The facts are so connected as to make it advisable to consider them together. It appears that in the year 1881, one Jose F. De Navarro formed a plan for the erection of eight large apartment houses on the block of land in the city of New York, bounded on the west by Seventh avenue, on the north by Fifty-ninth street, on the south by Fifty-eighth street, and extending easterly from Seventh avenue about 430 feet. He accordingly purchased the land described, and not being a citizen of the United States, took the title thereto in the name of his wife, who subsequently conveyed the same to one James Clyne, his confidential clerk and attorney in fact, who took title thereto as his agent and representative. For the purchase of the land, and for the making of excavations preparatory for the work of laying the foundations for the buildings, he paid the sum of $1,244,684.38, prior to July 1, 1883. In order to carry out his plans he organized eight different incorporations under the act of 1848, entitled " An act to authorize the formation of corporations for manufacturing, mining, mechanical or chemical purposes, and the sev-

eral acts of the legislature amendatory thereof or supplementary thereto," in each of which certificates the object was stated to be " the purchasing, leasing, acquiring, maintaining and improving real estate for residences and apartment houses, to be leased and conducted by the corporation and occupied by its stockholders and others." The eight incorporations so organized were known as the Barcelona Apartment Association, the Madrid Apartment Association, The Lisbon Apartment Association, the Cordova Apartment Association, the Granada Apartment Association, the Tolosa Apartment Association, the Salamanca Apartment Association and the Valentia Apartment Association. The capital stock of four of the incorporations was fixed at $280,000 each, and of the other four at $240,000 each. The capital stock of each was divided into sixteen shares. A subscriber to the capital stock became entitled to an apartment in the association building for each share of the stock subscribed for.

The land upon which the building of the association was constructed was to be leased to the association for the period of ninty-nine years, at a fixed rental, with the privilege to the association of purchasing the land, at a capital price which at five per cent. would yield the rent fixed upon, and the stock of each subscriber was subject to the payment of his proportion of the rent, taxes and other necessary charges. The appellant Kellogg and some other persons became subscribers to shares of stock in these associations, and paid the amount thereof to Navarro, some in cash, others in work and materials furnished and used upon the buildings. They took receipts from Navarro showing that the same were made upon their subscriptions, but no stock was issued to them. The amount of stock so subscribed for was, in the Barcelona, $120,000; the Madrid, $147,750; the Lisbon, $110,000; the Cordova, $110,000. Four mortgages were executed by Clyne to the Mutual Life Insurance Company, bearing date July 21, 1882, one upon the land to be occupied by the Barcelona building, for $200,000; one upon the land to be occupied by

the Madrid, $300,000 ; one upon the land to be occupied by the Lisbon, $300,000 ; and one upon the land to be occupied by the Cordova, $240,000. Four other mortgages were also executed by Clyne to the New York Life Insurance Company, bearing date October 8, 1883, of which one was upon the land to be occupied by the Granada, for $240,000 ; one by the Salamanca, $200,000 ; one by the Valentia, $260,000 ; and one by the Tolosa, $260,000. These mortgages were made to secure the bond of Clyne and Navarro, and were for the purpose of raising money with which to construct the buildings. Upon these mortgages the Mutual Life Insurance Company had paid over to Clyne, and he had turned the same over to Navarro, the sum of $833,000, and the New York Life Insurance Company had paid over the sum of $960,000. Of the four associations appellants, Navarro was the president until April, 1884, after which George S. Lespinasse became the president.

Clyne executed leases to each of the associations as agreed upon, in each of which there was a covenant that the association named therein should within a time fixed commence to erect and build on the premises an apartment house, but this was not done by either of the associations, but instead thereof Navarro, the president of each, commenced and erected such a building upon the lands of each out of the moneys mentioned.

On the 22d of May, 1883, Navarro, with certain other persons associated with him, organized another corporation to be known as the Central Park Building Company, Limited, the object of which, as stated in its certificate of incorporation, was the purchasing, leasing, acquiring, maintaining or improving of real estate for apartment houses in the city of New York ; and also the construction of such apartment houses, which, when completed, are to be leased and conducted under the control of the corporation, and occupied by its stockholders and others. The capital stock of this company was fixed at $800,000. At this time the subscription to

apartments of the association had stopped. The money derived from the insurance companies had been exhausted, and it was found that each building would cost $100,000 more than was estimated, making a total of $800,000 for the eight buildings. The Central Park Building Company, Limited, was designed as a construction company to complete the buildings, and with $800,000 capital it was hoped to be able to do so.

At this time Navarro asked his broker to find some one to furnish more capital for the enterprise, who thereupon brought about an interview between Navarro and the plaintiff, at which the plaintiff was asked to subscribe to the capital stock of the Central Park Building Company, Limited. This interview finally resulted in an agreement by which the plaintiff subscribed and paid for $300,000, one Adams subscribed for $100,000, which was paid for by the plaintiff, and Navarro agreed to subscribe and pay for the other $400,000, but did not do so.

The subscription by the plaintiff was under the agreement that Navarro should repay to him such amounts as the plaintiff should pay on his subscriptions, with the interest, and assume all liabilities of the company remaining unpaid, within ninety days after the completion of the buildings, if the plaintiff should elect or transfer to him all his interest in the company, notice of such election to be given within sixty days after the completion of the buildings. With the capital so acquired, the Central Park Building Company, Limited, undertook the completion of the buildings, and carried on the work until October 24, 1883. By this time its capital had become exhausted, and the plaintiff declined to advance more money, in consequence of which the work upon the buildings was stopped. This resulted in another agreement between the plaintiff and Navarro, bearing date December 1, 1883, in which agreement Navarro undertook to repay the plaintiff, with lawful interest, all sums of money theretofore advanced by the plaintiff on account of his subscription

to the capital stock of the building company and of the $100,000 subscribed by Adams and paid for by the plaintiff, together with all sums which the plaintiff should thereafter advance or become liable for in order to secure the completion of the buildings ; and for the purpose of providing means for the prosecution of the work upon the buildings, the plaintiff agreed to obtain and provide upon the commercial paper of the company, at lawful interest and five per cent. commission, in case it should be necessary for the plaintiff to furnish credit for security in order to raise the money on such commercial paper, such additional funds as should be necessary to pay the contractors for the work according to the terms and conditions of their several contracts, and to carry the work of the buildings on to completion, provided that the total cost of the lands and buildings should not exceed the sum of $4,500,000, which amount by a subsequent agreement was increased to $5,000,000.

The agreement further provided that James Clyne, in whom was vested the legal title to the land upon which the apartment houses were being erected, should make to the plaintiff eight mortgages of $100,000 each, with interest at six per cent., payable May 1, 1886, one on each of the eight several lots of land and buildings on which the houses were respectively situated, for the purpose of obtaining additional loans from the insurance companies, and if such mortgages were not taken by the insurance companies, or other parties, they were to be held by the plaintiff as securities for the advances to be made or procured by him. They also provided that Clyne should make to the plaintiff eight other additional mortgages for $50,000 each, with like interest, one upon each of the several eight lots of land and buildings, payable May 1, 1886, to be held by him as security for the repayment of such money as he may advance; and as further security, it was agreed that Navarro should also execute to the plaintiff a mortgage upon other property owned by him, in the sum of $300,000, as a security for the payment of the

sums previously advanced by the plaintiff, or procured by him. A bond was to accompany each mortgage. Pursuant to this agreement, the sixteen bonds and mortgages to be given on the lands occupied by the associations were executed by Clyne, but instead of delivering them to the plaintiff, they were, pursuant to another agreement bearing date the 14th day of January, 1884, placed in *escrow*, to be delivered to him and used for his protection in case it should be determined that sixteen other bonds and mortgages executed under the agreement of January 14th were invalid.

After the agreement of December 1st, and the execution of the bonds and mortgages by Clyne, the agreement of January 14th was entered into. Under it, Clyne conveyed the lands in question to the several associations occupying them, and thereupon each association executed and delivered to the plaintiff a bond and mortgage for $100,000, payable on the 1st day of May, 1886, and each association executed and delivered to the plaintiff an additional bond and mortgage for $50,000, payable at the same date. It was upon these securities the plaintiff advanced the moneys through the building company, with which the buildings were completed. The amounts so advanced by him, including the $400,000 previously advanced to the building company, is in the aggregate, $2,039,120.69. Of the moneys so procured and advanced by him, there were used and applied to the construction of the several apartment buildings, as aforesaid, the following sums, to wit:

| | |
|---|---:|
| The Madrid | $226,814.13 |
| The Lisbon | 239,422.82 |
| The Cordova | 205,023.70 |
| The Barcelona | 207,399.24 |
| The Granada | 272,748.98 |
| The Salamanca | 282,011.11 |
| The Valentia | 305,264.48 |
| The Tolosa | 300,436.23 |

Within the time prescribed by the agreement, the plaintiff elected to take back the moneys advanced by him under the several agreements referred to, and gave due notice thereof to the defendant Navarro. This action was brought upon the last mentioned bonds and mortgages given by the defendant, the Barcelona Apartment Association. The referee ordered judgment for the full amount called for by the bonds and mortgages, with the interest accrued thereon at the date thereof, amounting to $190,775 ; that the premises be sold, and out of the surplus arising from such sale, if any, there be paid to the plaintiff the full amount of money advanced by him to the Barcelona Association, namely, $207,339.24, with the interest thereon. The general term modified the judgment entered upon the report of the referee, in so far as it provided for the paying to the plaintiff of the surplus arising upon the sale, over and above that called for by the mortgages.

It is claimed that the judgment entered herein is for $120,000 more than it should be ; that the plaintiff should be charged with that amount, it being the par value of eight shares of the stock of the Barcelona Apartment Association. The facts are in substance as follows :

Pursuant to the agreement of January 14th, 1884, a meeting of trustees of each, the Madrid, the Lisbon, the Cordova, and the Barcelona Associations was held, at which resolutions were adopted to issue to Jose F. de Navarro, and certain other persons therein named, associated with him, the capital stock of the associations remaining unsubscribed for, amounting to thirty-two shares in all, which stock was to be issued to them as full paid, on behalf of and for the benefit of the Central Park Building Company, Limited. Pursuant to such resolution, subscription was made for such stock by the persons named, and on the 17th day of January thereafter, at a meeting of the trustees of the Central Park Building Company, Limited, such subscription was by that company ratified. It does not appear, however, that any of

the above mentioned stock was ever in fact issued. The plaintiff was not one of the parties to such subscription, nor was he ever a shareholder or an officer of any one of the associations. The stock so subscribed for in the different associations was of the par value, as follows:

The Madrid, six shares, par value . . . . . . . . $105,000  00
The Lisbon, ten shares, par value . . . . . . . .   175,000  00
The Barcelona, eight shares, par value  . . . . .   120,000  00
The Cordova, eight shares, par value . . . . . .    120,000  00
                                                  ─────────────
                                          $520,000  00

It is now claimed that these items should be charged to the plaintiff, and the amount thereof deducted from the several judgments under review upon this appeal ; that the stock was subscribed for on behalf of the Central Park Building Company, Limited ; that the plaintiff was the principle stockholder in such company, and as such he came into reciprocal relations of rights and obligations towards his fellow stockholders in the associations, and that those rights and obligations could not be affected by any subsequent action on his part.

The question thus presented involves a more careful consideration of the contracts of December 1, 1883, and January 14, 1884.

It will be remembered that at the time the plaintiff subscribed for the stock of the Central Park Building Company, Limited, it was upon the express agreement with Navarro that the plaintiff should have the right to return his interest in the company upon his election within sixty days after the completion of the buildings, and to recover the amount paid in and advanced to the company. The subscription, therefore, was a conditional one, depending upon the election that should subsequently be made. This understanding was recognized and more fully elaborated in the agreement of

December 1, 1883, wherein Navarro expressly agreed that he is liable and undertakes to repay the plaintiff, with lawful interest, all sums of money theretofore paid by the plaintiff on account of his subscription to the capital stock of the company, viz. : $400,000 ; and also any and all sums which the plaintiff may thereafter advance or become liable for, in order to secure the completion of the buildings, provided the plaintiff shall elect, within sixty days after the completion of the buldings, to take such moneys and interest.

As we have seen, this agreement was with Navarro, and is the one under which the sixteen bonds and mortgages were given by Clyne and placed in *escrow*, under the agreements bearing date the 14th day of January, 1884. These agreements were eight in number, one executed by each of the apartment associations named, Clyne, Navarro, the Central Park Building Company, Limited, and the plaintiff, all of whom were parties to such agreements. They are known as the five-party agreements. They are in substance the same. That of the Barcelona recites that it was originally intended that the association should erect and pay for an apartment house, on the land owned by Clyne, describing it, and to take a lease thereof for ninety-nine years, with the privilege of purchasing the same for the amount of the first mortgage thereon, made by Clyne to the Mutual Life Insurance Company. That as the building progressed it was found necessary to expend moneys in excess of the sum then obtained from the insurance company and subscriptions to apartments. That such necessary moneys were furnished to a large amount by the Central Park Building Company, Limited, and by the plaintiff. That on December 1, 1883, the plaintiff and Navarro made an agreement designed to provide funds and securities therefor, sufficient to complete the buildings, and that to carry out the details of that agreement the sixteen bonds and mortgages were made already alluded to. That they had decided that a more simple method effecting the intent of the parties was to have the land conveyed by

Clyne to the association, and that the bonds and mortgages of the association should be made to the plaintiff in place of those made by Clyne. The agreement then provides that " all the aforesaid bonds and mortgages which were made subsequent to December 1, 1883, were made for the purpose of carrying into effect the provisions of the agreement of that date, between said Navarro and McComb, and in the event ·of any controversy in respect thereto, the said bonds and mortgages should be construed and enforced with reference to, and in connection with said agreement, and in the same way as if said agreement, or the relevant portions thereof, had been written in each one of said bonds and mortgages. * * * That the said association acknowledges that it is liable for, and it promises to pay the money advanced by any of the parties hereto for the construction of the building on said land. The conveyance to said association is not to be treated as a conveyance of the building erected on said land, free and clear of the obligations to pay therefor, but the consideration mentioned in said conveyance is the value of the land only, and does not include the cost or value of the building thereon. The mortgages given to said McComb as aforesaid, shall be enforced, and their avails applied according to said agreement of December 1, 1883, and to that extent in reduction of the liability of said association to pay for said building."

It will thus be seen that the association by this agreement expressly undertakes to pay the money advanced by the plaintiff through the construction company, and that his mortgages shall be inforced and the avails applied according to the agreement with Navarro, under date of December 1, 1883. So that we have here recognized and adopted by the association all of the rights which the plaintiff had under the former agreement, one of which was the right to terminate his connection with the building company and recover the money that he had advanced. As we have seen, the plaintiff was not a subscriber for any of the stock of the as-

sociations.   His election, made in accordance with the agreements referred to, terminated his interests in the building company, and with it all interests that that company had in the stock held in trust for it.   Whatever his relations or liabilities may be as to the contractors and persons doing work or furnishing material for the construction of the building it is not material to now determine; but so far as the defendant association is concerned, his election constituted him a simple contract creditor.   The association took the title to the land from Clyne subject to the conditions of the December contract, which provides for the repayment of all of the plaintiff's advances.   The purpose of the contract is to give the plaintiff security to the limit fixed in the mortgages for his advances.

Again, it is claimed that the mortgages in suit were not given to secure a debt of the appellant association; that they were fraudulently contrived by the plaintiff to secure the payment of his claim against Navarro, and that they were consequently void.   As we have seen, it was recited in the five-party agreement, executed by the defendant association, that it was originally intended that this association should erect and pay for the apartment houses, but this was not done by the association.   Navarro, however, as its president, commenced the building, and carried it on until the moneys provided by the subscription to the stock and the loans of the insurance company had been exhausted.   Navarro, in this regard, acted for the association, evidently with the knowledge and consent of its officers, and must be deemed, therefore, to have been its agent.   After the money to which we have referred was exhausted, the Central Park Building Company, Limited, was organized, and with the money obtained from the plaintiff that corporation undertook the completion of the buildings.   This was done with the knowledge and consent of the officers of the defendant association.

The building company must therefore be considered as the agent of the association.   The acts of Navarro and of

38

the building company were in effect ratified and adopted by the defendant association in the five-party agreement alluded to. In that agreement it is provided that "as evidence of the amount of his advances, the said McComb may take receipts from said Central Park Building Company, Limited, signed by its president and treasurer for the time being, and such receipts shall be conclusive evidence of the amounts advanced or procured by the said McComb under the agreement of December 1, 1883, and of the dates of such advances."

The plan of operation thus adopted was simply this: The completion of the buildings of the associations was carried on by the building company; the money advanced by the plaintiff for the completion of the buildings was paid over to the building company, he taking the receipt of its officers therefor, in accordance with the agreement with the defendant association, and which it promised to repay to him.

It appears to us that the obligation became that of the appellant association, and that the security obtained by the plaintiff is free from the taint of fraud.

The payment of the mortgages is further resisted upon the ground that the five-party agreement, so-called, is claimed to be invalid, for the reason that it was executed on behalf of the appellant association, by Navarro, as president, and Lespinasse, as secretary, and by the Central Park Building Company, Limited, by Navarro, as president, and Clyne, as secretary. That these persons were interested in each of the corporations, and could not contract with themselves.

We do not regard it as necessary to consider the rights of Navarro, Lespinasse and Clyne, or that of the Central Park Building Company, Limited, for neither are here seeking relief under the contract. The plaintiff was an independent party to the contract, and the obligations entered into by the several corporations were chiefly with him. It is true, as we have seen, that he was a conditional subscriber to the stock of the building company, but this was subject to his

right of election to surrender his interest therein, and to be repaid the money advanced to it to be used for the benefit of the associations.

The association was engaged in the construction of the building, the construction was being made first through Navarro, and subsequently through the building company.    Through the election of the plaintiff he stands simply as an individual loaning the money necessary to complete the construction of the building.    The association derived all of the benefits.    There is no pretense that as to him there was anything unjust or unfair in the contract, or that the association is called upon to pay for anything that it has not had.    It consequently appears to us that as to the plaintiff the contract was valid and binding upon the association.

It is claimed that the association has been charged with the expenses of the organization and running of the Central Park Building Company, Limited, the salaries of its superintendent, fees of architect, etc.    Were the building company here seeking a recovery against the association there might be some question in reference to these charges, but treating the plaintiff as occupying the relation to which we have already alluded, they have no force, for the reason that he was loaning the money for the construction of the building, and the building was being constructed by the building company.    He was under the five-party agreement to pay the money over to that company, and take its receipt therefor, which receipt under the terms of the contract was to be conclusive evidence against the association.

Questions are also raised to the effect that the mortgages in suit were executed expressly to secure future advances only, and do not include the $400,000 advanced by the plaintiff to the building company; that the mortgages were tainted with usury, and that as to the appellant, the Barcelona Association, the requisite assent of two-thirds of the stockholders was not obtained to the making of the mortgages.

These questions have been fully considered in the opinion written in the general term. Our views are fully in accord with the conclusions there reached, and a further discussion of the questions we do not regard essential, for it of necessity would be largely a repetition of that which has been already stated.

As to the modification of the judgment by the general term, we must also approve, and for the reasons stated by that court. It follows that the judgment should be affirmed, but without prejudice to the rights of the lienors in the surplus moneys, without costs in this court to either party.

All concur.